1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 10cr0558 BTM |
| Plaintiff, | **ORDER DENYING MOTION TO DISMISS INDICTMENT** |
| v. | |
| SALVADOR HERNANDEZ-ESTRADA, | |
| Defendant. | |

### I.  INTRODUCTION

Defendant Salvador Hernandez-Estrada ("Defendant") has filed a motion to dismiss the indictment for (1) violation of the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861-78 ("JSSA"); (2) violation of the equal protection guarantee of the Fifth Amendment; and (3) violation of the fair cross-section requirement of the Sixth Amendment.  For the reasons discussed below, Defendant's motion is **DENIED**.

### II.  DISCUSSION

On February 18, 2010, a grand jury returned an indictment against Defendant, charging him with being a deported alien found in the United States in violation of 8 U.S.C. §§ 1326(a) and (b).  The grand jury that returned the indictment against Defendant was drawn from the Southern District of California's 2009 jury wheel.

Defendant seeks dismissal of the indictment in this case on the ground that the

Southern District of California (the "Southern District" or "District") has violated the JSSA, the Fifth Amendment, and the Sixth Amendment by relying solely on registered voter lists to fill the master jury wheel.  Defendant claims that the Southern District's failure to supplement its jury source list has resulted in underrepresentation of Hispanics and African-Americans on the Southern District's jury wheels since 1999.  Defendant also contends that the Southern District has violated the JSSA by (1) misstating the legal standard regarding English proficiency in Question 4 on the Juror Qualification Questionnaire; (2) failing to return questionnaires to prospective jurors who omit race/ethnicity information from their Juror Qualification Questionnaires; and (3) failing to compile jury representativeness statistics in accordance with the procedures set forth in the statute.

As discussed below, the Court agrees that there are flaws in the District's jury selection procedures and that improvements could be made.  However, the Court does not find that Defendant has established a violation of constitutional magnitude or a substantial violation of the JSSA.

## A. Fair Cross-Section and Equal Protection Claim

Defendant contends that due to the District's failure to supplement its jury source list, both Hispanic and African-American citizens have been persistently underrepresented on the District's master and qualified jury wheels since 1999.  Defendant alleges that this underrepresentation of Hispanics and African-Americans has resulted in violations of his Sixth Amendment and JSSA rights to a jury selected from a fair cross section of the community and his Fifth Amendment right to equal protection.  As discussed below, Defendant's fair cross-section and equal protection claims fail because Defendant has failed to establish underrepresentation of Hispanics and African-Americans.

1. Right to a Representative Jury Under the Fifth Amendment, Sixth Amendment, and JSSA

The Sixth Amendment provides that a criminal defendant has the right to trial "by an impartial jury."  U.S. Const. Amend. VI.  Fundamental to the right to trial by an impartial jury

is the requirement that a jury be selected from a fair cross section of the community.  <u>Taylor v. Louisiana</u>, 419 U.S. 522, 697 (1975).

The fair cross-section requirement is violated when the jury-selection process systematically excludes a distinctive group of the jury-eligible population.  <u>Duren v. Missouri</u>, 439 U.S. 357, 364 (1979).  A prima facie violation of the fair-cross-section requirement is established when the defendant shows:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

<u>Id.</u>

The JSSA, 28 U.S.C. § 1861, provides that "all litigants . . . shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."  "The test for proving a prima-facie constitutional violation in the selection of a fair cross section is the same for challenges under both the Sixth Amendment and 28 U.S.C. § 1861."  <u>Cannady v. Ojeda</u>, 54 F.3d 544, 546 (9th Cir. 1995).  In other words, under the JSSA, supplemental source lists are required to be added to voter lists only when "the jury selection plan produced juries constitutionally infirm."  <u>United States v. Brady</u>, 579 F.2d 1121, 1133 (9th Cir. 1978).

In order to establish an equal protection violation under the Fifth Amendment in the context of grand jury selection, the defendant must show that "the procedure resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs."  <u>Castaneda v. Partida</u>, 430 U.S. 482, 494 (1977).  The defendant can establish a prima facie case of an equal protection violation by (1) establishing that the group "is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or applied"; (2) proving the degree of underrepresentation "by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time"; and (3) showing that the selection procedure "is susceptible of abuse or is not racially neutral."  <u>Id.</u>

2. <u>Analysis</u>

Federal Defenders made the same fair cross-section/equal protection argument in <u>United States v. Jose Garcia-Arellano</u>, 08cr2876.   For the most part, Federal Defenders relies on the same reasoning and the same evidence.  Therefore, the Court incorporates by reference its discussion of these claims in its Order Denying Motion to Dismiss Indictment filed on June 9, 2009 in <u>Garcia-Arellano</u> ("<u>Garcia-Arellano</u> Order").  [Doc. No. 62].

Hispanics and African-Americans are "distinctive groups" in the community.  <u>Cannady</u>, 54 F.3d at 547.  Therefore, the Court turns to the issue of whether the representation of Hispanics and African-Americans in the jury pool is fair and reasonable in relation to the number of Hispanics and African-Americans in the community.

For the reasons discussed in <u>Garcia-Arellano</u>, the Court looks to the "absolute disparity" between (1) the percentage of Hispanics and African-Americans in the citizen population aged 18 and over; and (2) the percentage of African-Americans and Hispanics on the qualified wheel.  In computing the absolute disparity between the percentage of jury-eligible Hispanics and the percentage of Hispanics on the qualified wheel, the Court does not include in its calculations the individuals who did not report their ethnicity.  <u>See</u> <u>United States v. Rodriguez-Lara</u>, 421 F.3d 932, 944 n. 11 (9th Cir. 2005),

Set forth below are tables comparing the percentage of Hispanics and African-Americans in the citizen population aged 18 and over to the percentage of Hispanics and African-Americans on the "qualified" wheels for the years, 1999, 2001, 2003, 2005, 2007, and 2009.[1]

///

///

///

///

///

_____

[1] Defendant's experts' figures for the percentage of Hispanics and African-Americans in the citizen population aged 18 and over for the years 1999, 2001, 2003, 2005, and 2007 are substantially the same as the figures presented in <u>Garcia-Arellano</u>.

4                      10cr558 BTM

**Comparison of Hispanics in Citizen Population 18+ and
Hispanics on Qualified Wheel**

| Year | % Citizen Population 18+ | % on AO-12 | Absolute Disparity | Absolute Disparity (excluding individuals not reporting ethnicity) |
|------|--------------------------|------------|--------------------|------------------------------------------------------------|
| 2009 | 22.5 | 16.26 | 6.24 | - 2.07 |
| 2007 | 20.9 | 14.99 | 5.91 | - 2.15 |
| 2005 | 19.7 | 13.41 | 6.29 | -  .79 |
| 2003 | 18.8 | 14.49 | 4.31 | - 2.97 |
| 2001 | 17.8 | 5.76 | 12.04 | -  .14 |
| 1999 | 17.8 | 10.37 | 7.43 | 4.08 |

**Comparison of African-Americans in Citizen Population 18+
and African-Americans on Qualified Wheel**

| Year | % Citizen Population 18+ | % on AO-12 | Absolute Disparity | Absolute Disparity (excluding individuals not reporting race) |
|------|--------------------------|------------|--------------------|----------------------------------------------------------|
| 2009 | 5.2% | 3.09 | 2.11 | 1.71 |
| 2007 | 5.3% | 3.00 | 2.30 | 1.89 |
| 2005 | 5.5% | 2.96 | 2.54 | 2.18 |
| 2003 | 5.6% | 3.31 | 2.29 | 1.82 |
| 2001 | 5.8% | 3.58 | 2.22 | 1.98 |
| 1999 | 5.8% | 3.68 | 2.12 | 1.88 |

The absolute disparity figures found in the last column of these tables do not support a conclusion of underrepresentation. In fact, for most of the years, the absolute disparity between the percentage of Hispanics in the citizen population aged 18 and over and the percentage of Hispanics on the qualified wheel (excluding individuals who did not report ethnicity) is negative.

Defendant argues that the recent Supreme Court decision of <u>Berghuis v. Smith</u>, 130 S. Ct. 1382, __ U.S. __ (2010), permits the Court to stray from Ninth Circuit precedent and consider other modes of analysis, such as "comparative disparity" and "standard deviation theory." However, in <u>Smith</u>, the Supreme Court took no position on the matter. The Court noted that "[e]ach test is imperfect," and explained, "Even in the absence of AEDPA's constraint . . . we would have no cause to take sides today on the method or methods by which underrepresentation is appropriately measured." <u>Id.</u> at 1393-94. Accordingly, until the Ninth Circuit overrules <u>Rodriguez-Lara</u>, the Court is bound to follow it.

Defendant points to the results of a pilot project in Fresno as evidence that supplementation of the jury source list with DMV records results in greater representation of Hispanics on the master wheel. As discussed in the Court's order in <u>Garcia-Arellano</u>, the Court agrees that supplementation of the District's source list with DMV lists would result in greater inclusiveness, and potentially, better representation of minority groups that do not register to vote in the same proportion as non-Hispanic whites. However, the fact that representation of minority groups can be improved does not mean that the current selection procedures are in violation of the Constitution or the JSSA. Due to differences in population size and demographics, the Court cannot rely on the statistics from the Eastern District pilot project to draw any conclusion regarding the percentage by which Hispanic representation would be increased on the Southern District's jury wheel upon supplementation of the District's source list with DMV lists.

In his Reply brief, Defendant argues that his claim of underrepresentation of Hispanics on the District's jury wheel is buttressed by evidence that out of fifteen trials, all of which took place within the last nine months and involved a Federal Defender attorney, there were twelve where the venire was below 20% Hispanic. The Court is not persuaded by this evidence, which involves a small sample size and reliance on people's sur names to determine whether they are Hispanic. <u>See</u> <u>Reply</u> at 6 n. 2.

Defendant has not established underrepresentation of Hispanics or African-Americans on the District's jury wheels. Therefore, the Court denies Defendant's motion to dismiss the

indictment for violations of his Sixth Amendment and JSSA rights to a jury selected from a fair cross section of the community and his Fifth Amendment right to equal protection.[2]

**B. JSSA Violations**

Defendant alleges that the Southern District has violated the JSSA by (1) utilizing outdated language in Question 4 of the Juror Qualification Questionnaire, which has the effect of demanding a higher level of English proficiency than actually required by the JSSA; (2) failing to return questionnaires to prospective jurors who omit information regarding race and/or ethnicity; and (3) failing to prepare jury representativeness statistics unless prompted by litigation. As in Garcia-Arellano, the Court finds that although the Southern District may have violated provisions of the JSSA, Defendant has not established that the violations were substantial. Therefore, dismissal of the indictment is not warranted.

**1. Question 4**

Prior to the enactment of the JSSA in 1968, a person who was otherwise eligible for jury service would be disqualified if he or she was "unable to read, write, speak, and understand the English language." 28 U.S.C. § 1861 (1957). The JSSA revised the English language requirement, providing for disqualification if a potential juror is "unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form" or "is unable to speak the English language." 28 U.S.C. § 1865(b)(2), (3).

Question 4 of the Southern District's Juror Qualification Questionnaire asks: "Do you read, write, speak and understand the English language?" The prospective juror may respond "Yes" or "No." Question 4 is obviously based on the pre-JSSA standard for English language ability.

Defendant argues that Question 4 demands a higher level of English proficiency than

_____

[2] Defendant's equal protection claim also fails because Defendant has not established that Hispanics and African-Americans have been systematically excluded from registering to vote in this District. See Garcia-Arellano Order at 8-9.

is actually required by the JSSA and results in over-exclusion of Hispanic citizens from the qualified jury wheel. Defendant presents the following statistics regarding the rates at which Hispanics are lost during the qualification process compared to non-Hispanics:

| Year | Percentage decrease in Hispanic persons who return questionnaires to those who make it onto the "Qualified Wheel" | Percentage decrease in non-Hispanic persons who return questionnaires to those who make it onto the "Qualified Wheel" |
|------|------|------|
| 1999 | -40% | -37% |
| 2001 | -50% | -38% |
| 2003 | -45% | -40% |
| 2005 | -42% | -36% |
| 2007 | -45% | -37% |
| 2009 | -46% | -37% |

According to Defendant, a review of disqualified questionnaires from the 2009 wheel shows that Question 4 has resulted in the erroneous disqualification of many Hispanic and other minority jurors. With respect to the 2009 jury wheel, a total of 12,250 Hispanics returned their questionnaires. Only 6,625 made it onto the qualified wheel, meaning 5,625 were disqualified, excused, or exempted. At least 1,420 were disqualified because they answered "No" to Question 4. (Gov't Ex. 28.) In other words, 21.43% of all Hispanics returning their questionnaires were disqualified because they answered "No" to Question 4.

However, this disqualification rate does not direct the conclusion that Question 4's outdated language resulted in over-exclusion of Hispanic citizens from the qualified jury wheel. As evidence that the phrasing of Question 4 has resulted in the erroneous exclusion of Hispanic jurors, Defendant points to instances where individuals who identified themselves as Hispanic or Latino answered "No" to Question 4 even though they received at least a high school diploma/GED and indicated that they were employed in the community. (Def. Ex. H.) The Court does not find this evidence to be persuasive. Certain individuals who answered "No" to Question 4, including teachers in local public schools, bank tellers, and nurses in hospitals, must be able to read, write, understand, and speak English well if not fluently to perform their jobs. Accordingly, their "No" responses to Question 4 are clearly incorrect and cannot be blamed on confusion resulting from the phrasing of the Question. It is not outside

the realm of possibility that some of these individuals as well as others responded "No" in hopes of being disqualified from jury service.

As for the other individuals with high school/GED equivalent education and jobs in the community, the Court cannot conclude that these potential jurors would have been qualified if Question 4 had been worded in conformity with the JSSA.  According to the JSSA, the proper questions are:

- Can you read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily this juror qualification form?

- Can you speak the English language?

Assuming all of these individuals filled out their own forms, they clearly could read, write, and understand English well enough to complete the juror qualification form. While Defendant speculates that such individuals answered "No" to Question 4 because they assumed that they were required to have an ability to read, write, and understand English beyond what was necessary to fill out the juror qualification form, Defendant has not provided sufficient evidence to support this position.

Defendant attempts to show that Question 4 creates a misapprehension of the level of English proficiency required to serve on a jury by pointing to returned questionnaires where Hispanic individuals marked "No" to Question 4 and then wrote comments regarding their English language shortcomings.  (Def. Ex. J.)  It is true that Question 4 imposes a somewhat higher standard with respect to ability to read, write, and understand.   Instead of requiring the ability to read, write, and understand *with a degree of sufficiency to fill out the form*, Question 4 requires an ability to read, write, and understand in general.  However, only a few of the potential jurors who commented regarding their English language ability limited their difficulty with English to reading, writing, and/or understanding (as opposed to speaking).  For example, one woman noted that she spoke English but did not read or write very well. (Def. Ex. J at 255-56.)  Similarly, a man from Campo indicated that he did not write English well.  (Def. Ex. J at 261-62.)

The other potential jurors expressed concern regarding their English proficiency in general, *including their ability to speak English*.  Many potential jurors indicated that they

could not speak "fluently," could not speak "100%," could not speak well, had difficulty or trouble speaking, or could not speak at the level needed to serve on a jury.  As noted above, the JSSA requires potential jurors to be able to speak the English language, presumably at a level sufficient to carry out the duties of a juror.  28 U.S.C. § 1865(b)(3).  The Court does not interpret the potential jurors' use of the terms "fluent," "100%" or "well" as evidence that they read Question 4 as imposing a heightened requirement of fluency or 100% speaking ability.  The Court believes these terms were used as short-hand expressions of the potential jurors' beliefs that they do not speak English at a level sufficient to perform jury duty.[3]  The Court cannot say that they were wrong, and cannot conclude, as Defendant does, that "[n]one of these citizens should have been disqualified from jury service."

At any rate, there is nothing in the language of Question 4 that suggests a requirement that the potential juror be able to speak English perfectly or fluently.  Defendant argues that the way Question 4 is phrased coupled with the "legally irrelevant follow-up question about education" leads prospective jurors to believe that a higher level of English proficiency is necessary than that actually required by the JSSA.  The question about education is Question 13 on the Questionnaire.  The question does not immediately precede or follow Question 4 and is not located next to or close to Question 4.  The Court does not see how a potential juror would link the two questions together and conclude that English proficiency at an educated level is required.

The Court finds that alternative explanations are more likely to account for the number of Hispanics with high school/GED equivalent education and jobs in the community answering "No" to Question 4.  First, as noted above, such individuals could purposefully be seeking to be disqualified from jury duty.

---

[3]   The Court's reasoning also applies to Defendant's argument that the incorrect language of Question 4 is resulting in the erroneous exclusion of Asian jurors whose comments on completed questionnaires discuss concerns regarding not speaking fluently or completely.  Defendant also argues that the improper form of Question 4 results in the erroneous disqualification of deaf jurors from service.  However, as Defendant concedes, the three deaf jurors who marked "No" to Question 4 would probably still mark "No" to the separate question of whether they can "speak English."  In addition, the jurors indicated that they had a disability and explained their condition in the "Remarks" section.  Therefore, any improper disqualification of the deaf jurors does not turn on the language of Question 4, but, rather, raises different concerns that are not the focus of Defendant's motion.

Second, such individuals may not speak English at a level sufficient to perform jury duty. There are no available statistics regarding the percentage of Hispanic citizens over the age of 18 in San Diego County who can speak English with the degree of proficiency necessary to perform jury duty.[4]  Absent such statistics, the Court will not assume that individuals who have a high school/GED equivalent education and jobs in the community necessarily can speak English with this degree of proficiency.

The Questionnaire does not ask where the potential jurors were educated. Accordingly, it is possible that some of the individuals in question went to high school in Mexico. It should also be noted that the GED test is available in Spanish. Furthermore, the fact that these individuals have jobs in San Diego or Imperial County does not necessarily mean that they satisfy the English-speaking requirement. With respect to a number of jobs listed on the forms (e.g., self-employed house cleaner, a maintenance worker for the City of Calexico, a customer service representative, an auto body technician, a construction/maintenance worker for Brawley Union High School, a computer services free lancer, etc.) it is possible that the jobs are in primarily Spanish-speaking communities and/or that interaction with the English-speaking public is not required or is limited. Accordingly, the Court cannot draw the conclusion that if Question 4 conformed to the JSSA and the question "Are you able to speak the English language?" was asked separately, these individuals would have answered "Yes" instead of "No."

Defendant argues that the English language requirement in the U.S. immigration code, 8 U.S.C. § 1423(a)(1) (requiring "an understanding of the English language, including an ability to read, write, and speak words in ordinary usage in the English language"), provides a "baseline" of English competency for naturalized citizens. But the English language requirement only applies to naturalized, not U.S. born, citizens. Furthermore, a U.S.C.I.S.

---

[4] The Government provides some data from the American Community Survey ("ACS") regarding English language ability of foreign-born residents of San Diego and Imperial Counties who speak Spanish at home. (Gov't Exs. 12-14.)   However, this data includes non-citizens as well as individuals under the age of 18.  Some ACS data does focus on "native" (U.S. citizen) foreign-born individuals who speak Spanish at home.  But this data also includes children from the ages of 5 to 18.  The Government admits, "It was not possible to readily obtain data from the Census website for Imperial and San Diego Counties that selected for U.S. Citizenship, English language ability, and age 18 and above."  (Opp. at 28:3-5.)

1
2

Officer's determination that an individual speaks well enough to meet the naturalization requirements does not mean that the individual speaks with the level of proficiency needed to carry on deliberations with other jurors.

3
4
5
6
7
8
9
10
11
12
13
14
15

Absent evidence that the improper wording of Question 4 results in the erroneous disqualification of a significant number of Hispanics and/or other minorities, Defendant's JSSA claim fails.  A statutory challenge under the JSSA is allowed only for "substantial failure to comply with the Act."  United States v. Nelson, 718 F.2d 315, 318 (9th Cir. 1983).  "Technical violations are insubstantial where they do not frustrate the Act's goals of obtaining jury lists that are a cross-section of the community, allocating jury duty fairly among the citizenry, and determining disqualifications, excuses, exemptions and exclusions on the basis of objective criteria only."  United States v. Erickson, 75 F.3d 470, 477 (9th Cir. 1996).  For the most part, Defendant cannot establish that the potential jurors who answered "No" to Question 4 would have answered otherwise if the Question were phrased in conformity with 28 U.S.C. § 1865(b)(2), (3).   Therefore, the Court concludes that the District's use of outdated language in Question 4 is a technical violation that does not warrant dismissal of the indictment.

16
17
18
19
20
21
22
23
24

In addition to arguing that Question 4 results in the erroneous disqualification of Hispanic and Asian potential jurors, Defendant contends that a number of Hispanic and Asian potential jurors were disqualified by jury clerks even though they answered "Yes" to Question 4, seemingly because they made remarks about not being fluent in English, not speaking, reading, understanding or writing English well, or not understanding legal terms.  Defendant argues that these disqualifications strongly suggest a lack of court supervision in violation of 28 U.S.C. § 1865(a), which provides that the jury clerk acts "under supervision of the court," and CivLR 83.10(c)(5), which provides: "Questionable requests for being excused or other status determinations must be directed the court."

25
26
27
28

It does appear that there were some Hispanic and Asian potential jurors who answered "Yes" to Question 4 but were disqualified based on their remarks about their English language abilities.  (Def. Exs. M-P.)  The Court agrees that in instances where a potential juror marks "Yes" or both "Yes" and "No" to Question 4 and includes remarks about

his or her English language ability, the court should decide whether the potential juror is qualified. As already discussed, the level of English language ability needed to serve as a juror is difficult to quantify. The jury clerk should not make qualification determinations based on potential jurors' concerns regarding their understanding of legal terms or general level of fluency.

However, the Court does not find that Defendant has established a substantial violation of the JSSA in this regard. According to the JSSA's legislative history, the Act:

> . . . embodies two important general principles: (1) random selection of juror names from the voter lists of the district or division in which court is held; and (2) determination of juror disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only. These principles provide the best method for obtaining jury lists that represent a cross section of the relevant community and for establishing an effective bulwark against impermissible forms of discrimination and arbitrariness.

H.R. 1076, 90th Cong., 2d Sess., U.S.Code Cong. & Admin.News, 1968, p. 1793. Here, there is no evidence that the jury clerk was using subjective criteria in disqualifying the jurors in question – i.e., that the jury clerk made a judgment call about the degree of English-language ability as opposed to disqualifying all potential jurors who made remarks regarding their English-language ability. See United States v. Layton, 519 F. Supp. 946, 954-55 (N.D. Cal. June 24, 1981) (rejecting claim that clerk's excusal of potential jurors constituted a substantial violation of act because there was no allegation that the jury clerk was employing subjective or nonrandom criteria). Furthermore, the number of potential jurors who answered "Yes" to Question 4 but were disqualified based on remarks about English-language ability appears to be quite small (about a dozen Hispanics and half-a-dozen Asians).

Of course, the fact that small numbers of potential jurors are affected by the practice at issue does not mean that the District should not take the issue seriously and attempt to remedy the problem. Although the instant motion focuses on Defendant's right to a jury selected from a fair cross section of the community and whether there has been a substantial violation of the JSSA, the Court is mindful of the importance of ensuring that qualified individuals have the opportunity to serve on a jury in this District.

### 2. <u>Failure to Return Juror Qualification Questionnaires</u>

Defendant contends that the District's failure to return questionnaires to potential jurors who omit the information on race and/or ethnicity violates 28 U.S.C. § 1864(a) and makes it impossible to achieve an accurate view of the racial and ethnic composition of the master and qualified wheels.  As discussed in the <u>Garcia-Arellano</u> Order, although the Court believes steps should be taken to improve the response rate to the questions regarding race and ethnicity, the District's failure to return the questionnaires that omit this information is not a substantial violation of the JSSA.

The JSSA provides:  "In any case in which it appears that there is an omission, ambiguity, or error in a form, the clerk or jury commission *shall* return the form with instructions to the person to make such additions or corrections as may be necessary and to return the form to the clerk or jury commission within ten days."  28 U.S.C. § 1864(a) (emphasis added).  The JSSA does not specify which omissions are significant enough to require return of the form.  The JSSA also provides, "Any person who fails to return a completed juror qualification form as instructed *may be* summoned by the clerk or jury commission forthwith to appear before the clerk or jury commission to fill out a juror qualification form."  <u>Id.</u>  (emphasis added).

The Guide to Judicial Policies and Procedures (the "Guide") codifies administrative judiciary policies promulgated by the Director of the Administrative Office of the Courts or the Judicial Conference of the United States, or mandated by statute or regulation.  Volume 4, Chapter 23, § 23.04.d.5, provides:

> There is little or no case law dealing directly with prospective jurors' failure to answer specific questions on the qualification form.  Since the court has no mandatory obligation to police the unreturned form per se, it certainly follows that not every question need be answered.

> Some persons may find certain questions unclear, or perhaps for other reasons, some jurors fail to provide all the information on the form. When certain mistakes and omissions occur (e.g., no answer to the criminal records question or no signature), the form obviously should be returned to the juror for correction; for other omissions, it need not be.  <u>As a general rule, if missing information can be inferred from other answers on the form, or is not essential to the qualification decision, it is probably not necessary to send the questionnaire back.</u>

1  (Emphasis in original.)  Under the Guide's reading of § 1864(a), the Southern District is not

2  required to return questionnaires that omit information regarding race/ethnicity because such

3  information is not essential to the qualification decision.

4        The Court defers to the Administrative Office's interpretation of 28 U.S.C. § 1864(a),

5  which is reasonable.  Furthermore, the Court finds that any violation of this section by failure

6  to return questionnaires that omit race/ethnicity information is a technical one.  See United

7  States v. Marcano, 508 F. Supp. 462, 468 (D. Puerto Rico 1980) (rejecting the defendants'

8  argument that the inclusion on the qualified jury wheel of potential jurors who did not answer

9  the question regarding race constituted a substantial violation of the JSSA).

10        However, as previously discussed by the Court, it would be preferable if the District

11  amended its procedures to maximize the response rate to the race and ethnicity questions.

12  As shown in the following chart, the percentage of people who fail to provide information

13  regarding race/ethnicity is not insignificant.

| Year | Rate of Non-Response to Race Question | Rate of Non-Response to Ethnicity Question |
|------|---------------------------------------|--------------------------------------------|
| 1999 | 9.39% | 27.82% |
| 2001 | 12.72% | 60.76% |
| 2003 | 20.49% | 37.45% |
| 2005 | 19.14% | 38.27% |
| 2007 | 20.82% | 38.51% |
| 2009 | 18.17% | 35.85% |

21        Without complete information regarding the race and ethnicity of jurors,

22  representativeness statistics suffer in accuracy.  Reliable representativeness statistics are

23  important for purposes of monitoring the District's selection procedures and ensuring that the

24  District is complying with the JSSA.  Accordingly, it would be advisable for the District to

25  evaluate methods for maximizing the number of responses to the race/ethnicity question.

26        One suggested change is to place the instruction for Question 10 next to the question

27  on the front of the form to clarify that the race/ethnicity information is required to enforce

28  nondiscrimination in jury selection.  The current instructions, located on the *back* of the

questionnaire in the "Notes" section, provide:

> Federal law requires you as a prospective juror to indicate your race.  This answer is required solely to avoid discrimination in juror selection and has absolutely no bearing on qualifications for jury service.  By answering this question you help the federal court check and observe the juror selection process so that discrimination cannot occur.  In this way, the federal court can fulfill the policy of the United States, which is to provide jurors who are randomly selected from a fair cross section of the community.

Moving the instructions to the front of the form would potentially increase the response rate because people might be more willing to provide information regarding race/ethnicity if it is made clear that such information is required for beneficial purposes, not to invade privacy or collect meaningless data.

Defendant suggests that the response rate to the ethnicity question might be enhanced by placing the ethnicity question *before* the question on race.  Defendant points out that the U.S. Census has improved the response level of the Hispanic question by placing it before the race question.  This suggestion also seems reasonable.

Defendant also raises the possibility of using an Online Juror Qualification Questionnaire.  Defendant explains that at least 19 federal district courts accept submission of questionnaires online.  The online questionnaire apparently requires prospective jurors to answer the questions on race, gender and ethnicity before allowing them to proceed further. It is unclear what percentage of people utilize the online form in the districts that accept it and whether there has been a significant increase in the response rate to the race and ethnicity questions as a result.  However, it would still be worthwhile for the District to investigate the possibility of utilizing online questionnaires.

### 3. Timing of the Preparation of the AO-12 Forms

According to the JSSA, the Southern District is required to "submit a report on the jury selection process within its jurisdiction to the Administrative Office of the United States Courts in such form and at such times as the Judicial Conference of the United States may specify."  28 U.S.C. § 1863(a).  The Form AO-12: Jury Representativeness Statistics is the form that is used by the district courts to aid them in (1) determining whether their jury wheels

comply with the randomness and nondiscrimination provisions of the JSSA; and (2) comparing statistical samplings of jury wheels against general population data. (Def. Ex. T (Form AO-12: Jury Representativeness Statistics, Data Collection Instructions, General)). According to instructions provided by the Administrative Office on the form, the AO-12 form "is required to be completed upon . . . [t]he periodic refilling of the master wheel . . . ." Id.

It appears that the Southern District has not been completing AO-12 forms upon the refilling of the master wheel. The AO-12 for the 1999 wheel was completed in April 2004, the AO-12 for 2001 was completed in March 2004, and the AO-12 for 2003 was completed in September 2004. It appears that some of these AO-12 forms may have been prepared in response to a fair-cross-section challenge that was filed in United States v. Martinez-Orosco, 03cr2061 JAH, on January 23, 2004. The AO-12s for the 2005 and 2007 wheels were completed in November 2008, shortly after Garcia-Arellano filed his first set of motions challenging the jury selection procedures in this district and requesting production of AO-12 forms dating back one decade.

Defendant argues that by repeatedly failing to prepare the AO-12 forms unless and until prompted by litigation, the District is in substantial violation of 28 U.S.C. § 1863(a) and has undermined public confidence in the fairness of Southern District indictments and trials. The Court disagrees. Although Defendant has the AO-12 forms for 1999-2009, Defendant has failed to establish that the District violated the JSSA's fair-cross-section requirement. The fact that these forms should have been prepared sooner does not in and of itself constitute a substantial JSSA violation warranting relief.[5]

---

[5] Defendant suggests that if the forms were prepared in a timely manner, the jury judge would have seen that the Southern District was failing to monitor the number of questionnaires "[r]eturned undeliverable by P.O." from 1999 through 2007. Defendant argues that this is significant because a large number of undeliverable questionnaires can indicate a problem with the source list – e.g., the undeliverable questionnaires could be disproportionately returned from zip codes with high concentrations of minority populations. This argument is based on speculation. Defendant does not provide any grounds for suspecting that questionnaires are in fact being returned disproportionately from minority areas or that minorities are otherwise being disproportionately affected by undeliverable mail.

## C. __Recommendations__

Once again, the Court observes that a district need not and should not wait until there is a constitutional violation or substantial violation of the JSSA before implementing changes that further the JSSA's goals.  Given that the selection of a jury from a representative cross-section of the community "is an essential component of the Sixth Amendment right to a jury trial," Taylor v. Louisiana, 419 U.S. 522, 528 (1975), the District should vigilantly monitor its procedures, promptly address any technical JSSA violations that come to the District's attention, and proactively adopt changes that would improve compliance with the JSSA. To that end, the Court makes the following suggestions to the Clerk of the Court:

- The District should give serious consideration to adopting the recommendation of the Ninth Circuit Jury Trial Improvement Committee ("Committee") to supplement voter registrations lists with DMV lists to increase inclusiveness and provide better representation of the jury-eligible population.

- The District should also follow the Committee's recommendation to run addresses on the source list through the National Change of Address System.

- Question 4 on the Questionnaire should be amended to conform to the JSSA. The correct questions are:  (1) Can you read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily this juror qualification form?; and (2) Can you speak the English language?

- The District should consider moving the instruction for Question 10 from the back of the form to the front of the form to make it clear that the race and ethnicity information is being sought to ensure random selection from a fair cross-section of the community.

- The District should consider placing the question regarding ethnicity before the question regarding race.

- The District should evaluate whether allowing use of an online questionnaire would be beneficial.

- The District should consider implementing a policy of returning forms that omit

information regarding race and/or ethnicity.  To the extent the instruction for Question 10 is not placed on the front of the form, the returned forms should be accompanied by a notice that reiterates the language of the instruction.

• If, in response to Question 4, a potential juror marks "Yes," "Yes" and "No," or leaves the response blank, and also leaves remarks about his or her English language ability, the jury clerk should not disqualify the individual on the basis of English language proficiency, but, rather, should allow the court to make the determination.

## III.  CONCLUSION

For the reasons discussed above, Defendant's motion to dismiss the indictment is **DENIED**.

**IT IS SO ORDERED.**

DATED:  March 25, 2011

Honorable Barry Ted Moskowitz
United States District Judge

cc:    Hon. Irma E. Gonzalez, Chief Judge
       Hon. Janis L. Sammartino, Jury Judge
       W. Samuel Hamrick, Jr., Clerk of the Court

19                                                           10cr558 BTM